# EXHIBIT E

The Law Offices of P.B. Tufariello P.C.
INTELLECTULAW
25 LITTLE HARBOR ROAD
MOUNT SINAI, NY 11766

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-------------------------------------------------------------X Index No.: 03-12165

IN THE MATTER OF THE APPLICATION OF
GERALD JACINO, HOLDER OF ONE-HALF OF ALL
OUTSTANDING SHARES ENTITLED TO VOTE IN
AN ELECTION OF DIRECTORS, FOR THE
DISSOLUTION OF CLEAR STAR PRODUCTS INC.

**NOTICE OF MOTION**
MOTION/CROSS MOTION/OSC
FEE PAID

IAS JUSTICE ASSIGNED:
Hon. Elizabeth Hazlitt Emerson, J.S.C.

-------------------------------------------------------------X Return Date: July 30, 2004

COUNSEL:

PLEASE TAKE NOTICE that upon the annexed Affidavit of Gerald Jacino, sworn to on the 7th day of July, 2004, the exhibits annexed thereto and all the papers and proceedings heretofore had herein, the undersigned, attorneys for the petitioner, will move this Court at the Courthouse thereof located at 235 Griffing Avenue, Riverhead, New York 11901, on the 30th day of July, 2004, at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for an order as follows:

1. pursuant to Business Corporation Law 1117 and 1008, declaring that the various claims and liabilities totaling $65,934.84 that had to be and were paid by Clear Star Products, Inc. ("Clear Star") without the signature of Anthony Jacino, were valid corporate obligations and that Clear Star's payment and satisfaction of those claims and liabilities is judicially approved;

2. compelling Anthony Jacino to:

    a. account to Clear Star and Gerald Jacino for all Clear Star funds that have come into his or his new company Glass Star America, Inc.'s possession since January 21, 2004;

    b. disgorge and pay over to Clear Star the sum of $28,900.33, as well as any other Clear Star funds or receivables that he wrongfully diverted, retained and/or converted to his own use since January 21, 2004; and

    c. return to 355 Marcus Boulevard, Hauppauge, New York, the Clear Star truck (VIN # 1B7KF26Z1VJ551600) so that Clear Star may finally sell that asset as is required by the Second So-Ordered Stipulation between the parties dated January 16, 2004 (the "Second Stipulation"), and granting Gerald Jacino the right to

1

JAC001243

market, sell and execute any transfer documents required to consummate the sale of said vehicle;

3. compelling Anthony Jacino to immediately transfer to his company Glass Star America, Inc. the Wal-Mart account that he is currently servicing on Clear Star's behalf, to provide a full accounting of all sales made to, product shipped to, and money received from Wal-Mart since January 21, 2004, and enjoining Anthony Jacino from doing any business as an agent or on behalf of Clear Star Products, Inc. with Wal-Mart or any other person or entity,

4. compelling Anthony Jacino to provide Gerald Jacino with the access codes necessary to access Wal-Mart's "Retail Link" online account system for as long as Anthony Jacino and/or Glass Star America, Inc. sells "Clear Star" trademarked products to Wal-Mart so that Gerald Jacino may monitor the Wal-Mart account information and commissions due him under the parties' Second Stipulation;

5. together with such other and further relief as to this Court may seem just and proper.

**PLEASE TAKE FURTHER NOTICE** that pursuant to CPLR 2214(b) answering papers, if any, shall be served on the undersigned attorneys at least seven (7) days prior to the return date hereof.

DATED: Riverhead, New York
July 7, 2004

TWOMEY, LATHAM, SHEA & KELLEY, LLP

By: _____
BRYAN C. VAN COTT, ESQ.
Attorneys for Petitioner GERALD JACINO
33 West Second Street
P.O. Box 9398
Riverhead, New York 11901
(631) 727-2180

TO: LAW OFFICES OF ROBIN L. KISSIN, ESQ., P.C.
Attorneys for Anthony Jacino
90 Whippoorwill Lane
P.O. Box 220
Quogue, New York 11959
(631) 614-7847

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
------------------------------------------------------------------X  Index No.: 03-12165

IN THE MATTER OF THE APPLICATION OF
GERALD JACINO, HOLDER OF ONE-HALF OF ALL **AFFIDAVIT**
OUTSTANDING SHARES ENTITLED TO VOTE IN **IN SUPPORT**
AN ELECTION OF DIRECTORS, FOR THE
DISSOLUTION OF CLEAR STAR PRODUCTS INC.

------------------------------------------------------------------X

STATE OF NEW YORK  )
                   ) ss:
COUNTY OF SUFFOLK  )

GERALD JACINO, being duly sworn deposes and says:

1. I am the petitioner in this dissolution proceeding and, as such, I am fully familiar with the facts and circumstances set forth herein.

2. I submit this affidavit in support of my motion to obtain much needed finality with regard to the shareholders' separation and the winding-down of Clear Star Products, Inc. ("Clear Star") begun this past January pursuant to the Second So-Ordered Stipulation dated January 16, 2004 (the "Second Stipulation") (Exhibit "A" hereto). This motion has been made necessary by the fact that Anthony Jacino, my brother and the other 50% shareholder of Clear Star, has refused and continues to refuse to act reasonably and responsibly in resolving the tax, insurance, and accounting issues that still remain since he and I separated the company's assets and customers on January 21, 2004.

3. Specifically, my motion requests an order:

    a. declaring that the various claims and liabilities totaling $65,934.84 that had to be and were paid by Clear Star without the signature of Anthony Jacino, were valid corporate obligations and that Clear Star's payment and satisfaction of those claims and liabilities is judicially approved;

    b. compelling Anthony to:

JAC001245

i. account to Clear Star and me for all Clear Star funds that have come into his or his new company Glass Star America, Inc.'s possession since January 21, 2004;

ii. disgorge and pay over to Clear Star the sum of $28,900.33, as well as any other Clear Star funds or receivables that he wrongfully diverted, retained and/or converted to his own use since January 21, 2004; and

iii. return to Clear Star the company truck (VIN # 1B7KF26Z1VJ551600) so that Clear Star may finally sell that asset as is required by the Second Stipulation.

4. As more fully demonstrated below, to put an end to the products liability and continuing tax problems and liability that Anthony's acts and omissions are wrongfully causing Clear Star to suffer, this Court should also compel Anthony (i) to immediately transfer to his new company Glass Star America, Inc., the Wal-Mart account, which he is "servicing" pursuant to the Second Stipulation (currently on behalf of Clear Star Products, Inc.), (ii) to provide a full accounting of all sales made to, product shipped to, and money received from Wal-Mart since January 21, 2004, (iii) to give me full access to Wal-Mart's "Retail Link" online customer account system so that I may be apprised of the business being done with Wal-Mart and the commissions that are and will be due me under the Second Stipulation for as long as "Clear Star" trademarked product is sold to Wal-Mart, and, finally, (iv) enjoining Anthony from doing any business on behalf of Clear Star Products, Inc. with Wal-Mart or any other person or entity.

5. We absolutely need the Court's prompt intervention to bring an end to Anthony's purposeful inaction, his continued contempt for this Court's orders, his continuing conversion of Clear Star money and property, and his continued breach of the Second Stipulation, and to bring finality to the separation process and the wind-down of Clear Star's books and records that was begun in January.

**Factual Background**

2

JAC001246

6. I commenced this dissolution proceeding in May, 2003, after a year of hostility from and deadlock with my brother and 50% partner, Anthony Jacino.

7. On September 24, 2003, Anthony and I signed a So-Ordered Stipulation whereby we agreed to equitably divide Clear Star's customer accounts and its physical assets, and to physically separate from each other by November 30, 2003 (the "First Stipulation") (Exhibit "B" hereto).

8. The separation was stayed by Order to Show Cause dated November 24, 2003 (Emerson, J.), pending the resolution of issues relating to the health and transferability of Clear Star's largest customer account Wal-Mart and the discovery of unfair competition by Ryusei Community Inc., a third party competitor that threatened and continues to threaten the entire Japanese market for "Clear Star" products.

9. To resolve those issues and proceed with the separation, on January 16, 2004, Anthony and I signed a Second So-Ordered Stipulation (the Second Stipulation) (Exhibit "A") whereby we agreed, among other things, to share the benefits (albeit unequally) and the risk of the $250,000 per year Wal-Mart account by giving Anthony the right to "service" the account and collect and keep the lion's share of receivables generated thereby and by giving me the right to collect a modest 10% weekly commission on gross sales made in the previous week (instead of having the account assigned to just one shareholder), and we further agreed that all Japanese customers would be assigned to my customer list so that I could better protect the Japanese market for "Clear Star" products.

10. The Second Stipulation also contained a provision at my insistence that no Clear Star checks would be issued without the joint signatures of both Anthony and me (Second Stipulation, ¶17 [Exh. A]) so as to stop Anthony's continued theft of Clear Star funds since, in addition to the tens of thousands of dollars of Clear Star checks that he issued to himself in 2003

3

JAC001247

in violation of the March 14, 2003 So-Ordered Stipulation entered in *Anthony Jacino v. Gerald Jacino et al.* (Index # 03-5862) (Exhibit "C"), Anthony wrongfully issued another $24,904.31 worth of checks in December and January, which was the subject of my Order to Show Cause filed on January 14, 2004.

11. In accordance with the Second Stipulation, we did divide Clear Star's customer accounts and its physical assets, and we did physically separate from each other on January 21, 2004.

12. Almost immediately after January 21, 2004, however, Anthony began using the Second Stipulation's joint signature provision to frustrate the orderly payment of Clear Star's legitimate accounts payables and he purposefully breached the Second Stipulation and obstructed and continues to obstruct the orderly wind-down of the company.

13. As also detailed in my opposition to Anthony's recent Order to Show Cause submitted on May 5, 2004, despite numerous written and oral demands from my attorney and me since late January, Anthony has absolutely refused to (1) sign the corporate checks needed to timely pay the legitimate Clear Star accounts payable, which resulted in various creditors demanding payment and threatening action against Clear Star, (2) return the company vehicle valued at over $11,000, so that it may be sold as per the Second Stipulation (Exhibit "D"), and (3) return to Clear Star the over $28,900 of company receivables that he has since converted to his own use (Exhibits "E").

14. On top of that, on March 17, 2004, I learned that Anthony had AGAIN secretly ordered from Clear Star's bank, JPMorgan Chase Bank, a new set of company checks for his personal use so that he could continue to unilaterally and wrongfully cut himself tens of thousands of dollars worth checks as he has done time and again and in blatant disregard and violation of the March 14, 2003 So-Ordered Stipulation (Exhibit "C"). I later obtained a bank

JAC001248

print-out and letter confirming that Anthony ordered and sought to obtain more company checks so that he could continue his theft of corporate money (Exhibit "F" hereto).

15. As a result of Anthony's purposeful inaction, historical contempt for this Court's orders, and recent ordering of more company checks, I felt I had no choice but to act quickly and in good faith to pay and satisfy the numerous legitimate company payables that have been on the company books for months, before Anthony unilaterally took the money for himself using the unauthorized checkbooks (as he did all last year, and as he did yet again on April 8, 2004, with a bank check representing a $13,500 receivable that was wired into Clear Star's account [see Exhibit "G" hereto], and again on April 15, 2004, by using an unauthorized company debit card to pay $423 to Pearl Vision Center for his personal eye exams and hardware [see Exhibit "G"]).

16. I provide below a full accounting of those payables that were paid without Anthony's signature so that the Court may approve those payments and finally put the payables issue to rest.

17. In addition to willfully and wrongfully obstructing the payment of Clear Star liabilities and his breach of the Second Stipulation's requirement that the company truck in his possession be sold, Anthony further violated and continues to violate the Second Stipulation's requirement that he provide me with documentation on a weekly basis to account for all sales made to Wal-Mart and the weekly commissions that are due me.

18. Instead, Anthony has ignored his obligations and has attempted to exert complete dominion and control over Clear Star and the Wal-Mart account, despite the fact that I remain Clear Star's president, a 50% shareholder and a director, and I have every right and an obligation to be concerned about, be fully informed of, and have a say with regard to Anthony's activities on Clear Star's behalf.

JAC001249

19. Anthony has frozen me out of having any knowledge about the Wal-Mart account and he has fraudulently advised Wal-Mart that I have no authority with regard to Clear Star Products, Inc. To complete the freeze out, Anthony surreptitiously changed Clear Star's access codes to Wal-Mart's online "Retail Link" account information so that I could no longer access the sales and account information to which I am entitled.

20. Moreover, despite my and my attorney's demands made months ago, Anthony still has not demonstrated that he has obtained the proper insurances to sell products on behalf of Clear Star, thus imposing unnecessary costs and potential liabilities on the corporation.

21. Clear Star's fiscal year ended on June 30, 2004, and it will be required to file tax returns for the 2003/2004 tax year in September, 2004.

22. Although the Second Stipulation gave Anthony until October 2005 to complete the transition of Wal-Mart for "servicing" purposes to his new company Glass Star America, Inc., Anthony's continued unilateral actions and his absolute refusal to communicate and/or cooperate has made the Wal-Mart account servicing portion of the Second Stipulation completely unworkable. He has subjected Clear Star to untold products liability and continued tax liability as a result of his operating as Clear Star Products, Inc. and this must end immediately.

23. Judicial intervention is necessary so that Clear Star's books and records may be brought to a close and all issues relating to the separation may be finalized lest the shareholder deadlock and abuses inflicted by Anthony upon Clear Star and me continue indefinitely.

A. **This Court Should Declare the $65,934.84 Paid by Clear Star Without Anthony's Signature to be Valid Clear Star Obligations**

24. On March 17 and thereafter, I caused Clear Star to pay the following legitimate Clear Star obligations/payables in an effort to wind-down the company's affairs, and avoid the

6

problems being created by Anthony's intentional and frivolous refusal to pay Clear Star's payables and about to be created by his inevitable theft of corporate money:

| Payee | Amount | Obligation/Account Payable |
|---|---|---|
| Midway Associates | $10,371.65 | Lease Obligation (through 1/22/04) |
| LIPA | $2,521.65 | Lease Obligation (through 1/22/04) |
| Keyspan | $2,032.26 | Lease Obligation (through 1/22/04) |
| Konica Minolta | $1,078.89 | Copier Lease Obligation |
| AAPEX | $1,995.00 | Trade Show Booth Fee |
| Safety Kleen | $1,055.97 | Clear Star Hazardous Waste Removal |
| Spring Systems | $454.70 | EDI for Wal-Mart (1/1 - 1/22/04) |
| Plastic Dip | $410.66 | Clear Star Purchase Order |
| UPS | $630.65 | Shipping Charges (1/19 – 1/23/04) |
| Richard Rudolph | $1,800.00 | Accountant Fee |
| Frank Amato | $2,485.63 | Wage Obligation |
| Gerald Jacino | $386.00 | Expense Reimbursement |
| Gerald Jacino | $24,904.31 | Shareholder Equalization Payment (resulting from Anthony's unauthorized payment of same sum to himself in 12/03-1/04) (see OSC dated 1/14/04)[1] |
| Hinz | $2,400.00 | Per Second Stipulation (¶8) |
| Generation Plastic | $3,950.00 | Per Second Stipulation (¶8) |
| SEMA | $1,596.00 | Trade Show Booth Fee |
| SEMA | $1,995.00 | Balance due for trade show |
| Traveler's Ins. | $1,530.13 | Clear Star Insurance Premium |
| Konica Minolta | $1,874.55 | Lease Termination fee for copier |
| Willow's Glass | $53.70 | Refund of Duplicate Payment |
| Liedel Fitzmaurice | $167.91 | Sales Rep Commission |
| Broadview | $40.17 | Telephone |
| Natter & Natter | $350.00 | Legal Fee for Patent Work |
| Natter & Natter | $1,850.00 | Legal Fee for Patent Amendments |

TOTAL $65,934.84

25. Annexed hereto is a full accounting of my payment of the above-listed Clear Star obligations and payables, and what follows is a demonstration of each payable's legitimacy and my good faith in causing them to be paid. See Exhibit "H(1)" through "H(23)" hereto annexing all relevant creditor invoices, cancelled checks and other proof of claim and payment.

---

[1] A copy of the various checks that Anthony contemptuously issued to himself totaling $24,904.31 in violation of the March 14, 2003, So-Ordered Stipulation is annexed hereto as Exhibit "H(13)".

7

JAC001251

26. The following obligations are not and cannot be at issue since Anthony did not object and, instead, through his accountant David Kandell and his own writings, actually provided his consent (see Exhibit "A", "H(19)" and "I" hereto), to the payment of the following Clear Star obligations:

| | | |
|---|---|---|
| Hinz | $2,400.00 | As per Second Stipulation (Exh. A, ¶8) |
| Generation Plastic | $3,950.00 | As per Second Stipulation (Exh. A, ¶8) |
| Konica Minolta | $1,078.89 | As per Anthony's Handwritten Note (Exh. H(4)) |
| Konica Minolta | $1,874.55 | As per Anthony's Handwritten Note (Exh. H(19)) |
| AAPEX | $1,995.00 | As per David Kandell's Letter (Exh. I, p.2) |
| Spring Systems | $454.70 | As per David Kandell's Letter (Exh. I, p.2) |
| Plastic Dip | $410.66 | As per David Kandell's Letter (Exh. I, p.2) |
| UPS | $630.65 | As per David Kandell's Letter (Exh. I, p.2) |
| Willow's Glass | $53.70 | As per David Kandell's Letter (Exh. I, p.2) |
| Total | $12,848.15 | |

27. Moreover, the following payables are not and should not be at issue as they relate to Clear Star's ongoing obligations to third parties for telephone service, hazardous waste disposal which was arranged-for in December 2003 prior to the separation, liability insurance, and commissions due to a Clear Star sales representative that was incurred prior to separation:

| | | |
|---|---|---|
| Broadview | $40.17 | Telephone (Exh. H(22)) |
| Safety Kleen | $1,055.97 | Hazardous Waste Clean Up (Exh. H(6)) |
| Traveler's Ins. | $1,530.13 | Liability Ins. through June 30, 2004 (Exh. H(18)) |
| Liedel Fitzmaurice | $167.91 | Sales Representative Commission (Exh. H(21)) |
| Total | $2,794.18 | |

28. The SEMA trade show booth payables are also not subject to any objection since they were incurred and paid by Clear Star pursuant to the agreement made by Anthony and myself on January 16, 2004. We agreed to use Clear Star's established seniority to purchase two trade show booths at both the SEMA trade show and the AAPEX trade show, which we would then divide and utilize for our new companies. We agreed that Anthony would get first choice with regard to the AAPEX trade show booths and I would get first choice with regard to the

8

JAC001252

SEMA trade show booths. Clearly, there can be no legitimate objection to the two SEMA payments:

| | | |
|---|---|---|
| SEMA | $1,596.00 | First Installment Due (Exh. H(16)) |
| SEMA | $1,995.00 | Balance due for Trade Show Booths (Exh. H(17)) |
| **Total** | **$3,591.00** | |

29. Likewise, there is and cannot be any legitimate objection to the payment of Clear Star's rent liabilities through January 22, 2004. Clear Star conducted its full business operations from the leasehold premises at 355 Marcus Boulevard, Hauppauge, New York, through the date that Anthony and I finally separated on January 21, 2004. Clear Star's written lease obligates it to pay each month to the landlord Midway Associates, Inc. rent in the sum of $11,200 per month, additional rent in the sum of $2,943.16 per month for real estate taxes (1/12 of the annual assessment), and utilities. A copy of Clear Star's written lease with Midway and Anthony's written insistence that the full $11,200 be paid as rent each month is annexed as Exhibit "J" and the real estate tax bill is annexed as Exhibit "K". Accordingly, there can be no legitimate objection to Clear Star's payment of its following lease obligations which were pro-rated through January 22, 2004:

| | | |
|---|---|---|
| Midway Associates | $10,371.65 | Pro-Rated Rent and Real Estate Taxes (Exh. H(1)) |
| LIPA | $2,521.65 | January 2004 Electricity (Exh. H(2)) |
| Keyspan | $2,032.26 | January 2004 Natural Gas (Exh. H(3)) |
| **Total** | **$14,925.56** | |

30. Clear Star's accountant Richard Rudolph, CPA, has acted as such for over 25 years. On or about November 26, 2002, Richard Rudolph, Anthony, and I had a meeting during which Anthony insisted that my son, Gerald Jacino Jr., no longer perform any in-house accounting functions. As a result of Anthony's demand that Gerald Jr. cease all in-house accounting, it was proposed and Anthony agreed to have Richard Rudolph begin performing all

9

JAC001253

Clear Star related accounting functions for a flat fee of $1,800 per month, which included, among other things, reconciling bank accounts each month, continuous review of expense classifications and general ledger, year-end closing, preparing quarterly and yearly tax returns, and providing ongoing assistance. Accordingly, Richard Rudolph undertook the agreed-upon responsibilities and he was paid $1,800 each month since then with Anthony's knowledge and consent. Upon Anthony's and my separation, Clear Star absolutely required and it still requires the dedicated services of Richard Rudolph to maintain and eventually close Clear Star's books of account and file returns. Because of the accounting time and effort required immediately following the separation, the monthly fee payment to Richard Rudolph of $1,800 for the month of February 2004 was entirely reasonable and justified; Anthony's unreasonable objection and insistence that his own accountant take over such functions is not.

31. In 1999, Anthony hired Frank Amato as a Clear Star salesman on a salary plus commission basis and he was paid accordingly throughout his employment with Clear Star, which lasted through January 21, 2004, the date of Anthony and my separation. Upon the separation, there was $2,485.63 in outstanding commissions due and owing to Frank for sales made from May 2003 through December 2003, the calculations for which were provided to Anthony for review (Exhibit "L" hereto). Anthony, however, in bad faith refused to consent to pay Frank because Frank did not agree to work for Anthony's new company. There is no legitimate objection here, only bad faith retribution. The second paragraph of Anthony's accountant David Kandell's letter (Exhibit "I") demonstrates the bad faith.

32. Anthony had agreed in the First Stipulation to pay half the cost of the legal fees owed to Natter & Natter (successor to Art Auslander, Esq.'s patent practice) for their patent work on Anthony and my two pending patent applications. See Exhibit H(23). The First Stipulation (Exh. B) states in paragraph 1(a)(vi)(3) of the Separation Plan attachment as follows:

10

JAC001254

> For the two pending patent applications, the parties agree to split
> the cost, if any, of any remaining work to be done by Art
> Auslander, Esq. to finalize the patents. Each party agrees to be
> responsible for one-half of any costs required to maintain the
> patents. If any party refuses to contribute their share of the costs,
> then they shall be deemed to have abandoned their ownership in
> the patent and the other party shall have the right to prevent any
> future infringement upon its use.

33. Anthony is clearly responsible for and cannot object to Clear Star's payment of Natter & Natter's two invoices unless, of course, he is willing to agree that he has abandoned his ownership interest in the patents.

34. Finally there are the two checks made payable to "Gerald Jacino" in the sum of $386.00 as and for expense reimbursements and $24,904.31 as and for a shareholder equalization payment.

35. The expense reimbursements relate to my layout of money for Clear Star's Quickbook's computer support ($175) and my layout of money for an airline ticket to attend the Mobile Tech Expo 2004 trade show in Florida ($211). These items were properly expensed to and reimbursed by Clear Star. Indeed, Anthony repeatedly used his unauthorized debit card to purchase airline tickets and, using that card, he even purchased two tickets so that he and his son could attend the Mobile Tech Expo 2004 trade show. Clearly, Anthony can have no legitimate objection to this payable.

36. The $24,904.31 equalization payment was absolutely due me as a result of Anthony's contemptuous payment to himself of $24,904.31 in company funds last December and January (see Exhibit "H(13)"), which contempt was the focus of the Order to Show Cause that I brought on January 14, 2004 in the Anthony Jacino v. Gerald Jacino et al. action. Anthony's payment of those funds to himself had absolutely no legitimate business purpose. It was an unauthorized, illegitimate, and contemptuous grab for cash and had I not equalized the

11

JAC001255

distribution, Anthony would most definitely have widened the existing gap even further by taking even more money. As it is, Anthony has converted over $28,900 in Clear Star funds since our separation on January 21, 2004, which he should be forced to repay.

B. **This Court Should Compel Anthony to Provide a Full and Detailed Accounting of Any and All Clear Star Funds that Have Come Into His or His New Company Glass Star Products, Inc.'s Possession Since January 21, 2004, and to Disgorge the $28,477.33 and any other Clear Star funds that He or His New Company Glass Star Products, Inc. Converted to Their Own Use.**

37. Despite numerous written and oral demands from my attorney and me since late January, Anthony has absolutely _refused_ to return to Clear Star the over $28,900 of company receivables that he has since converted to his own use (Exhibits "E" and "G") or return the company vehicle valued at over $11,000, so that it may be sold as per the Second Stipulation (Exhibits "C" and "D").

38. Anthony has admitted in a letter dated April 7, 2004 (Exhibit "E") that he or his company Glass Star Products, Inc. received from Wal-Mart the sum of $3,370.23 for product that was shipped and invoiced by Clear Star prior to January 22, 2004. He has refused to return that sum to Clear Star.

39. In that same letter, Anthony admitted to receiving and retaining $11,607.10 in other accounts receivable that rightfully belong to Clear Star.

40. One day later, on April 8, 2004, Anthony converted another $13,500 receivable that was paid into Clear Star's account by issuing _to himself_ a bank check in that sum (Exhibit "G").

41. On April 15, 2004, Anthony again converted Clear Star funds by using an unauthorized company debit card to pay $423 to Pearl Vision Center for his personal eye exams and hardware [_see_ Exhibit "G"]).

12

JAC001256

42. The foregoing demonstrates that Anthony converted to his own use at least $28,900.33 of Clear Star funds since January 21, 2004.

43. Clearly, in order to obtain finality, Anthony must be compelled to account for all the Clear Star funds he or his new company received and he should be made to pay it all back to Clear Star so that Clear Star may satisfy its remaining liabilities and, at the appropriate time, distribute the remainder equally between the shareholders.

C. **This Court Should Compel Anthony to Return the Clear Star Truck to 355 Marcus Boulevard, Hauppauge, New York, and Order that it Be Sold In Accordance With the Second Stipulation**

44. The Second Stipulation clearly states that "The parties agree that the company truck shall be sold on the open market for the highest price reasonably obtainable." See Second Stipulation, ¶5 (Exhibit "A").

45. In blatant and contemptuous violation of that so-ordered stipulation, Anthony took possession of the company truck and refused to return it despite my and my attorney's demands that he do so. See Exhibit "D".

46. Accordingly, this Court should direct Anthony to return the truck and, to avoid Anthony's obstructionist behavior, give me full authority to market and sell the truck on the open market for the highest price reasonably obtainable so that the sale proceeds can be placed in Clear Star's account as and for a reserve for remaining liabilities.

D. **This Court Should Compel Anthony to Transfer the Wal-Mart Account to His New Company Glass Star America, Inc. Immediately, Provide Clear Star and Me With a Full and Ongoing Accounting of His Wal-Mart Activities, and Give Me Access to Wal-Mart's "Retail Link" Online Account Information**

47. Anthony has abused the privilege given him under the Second Stipulation to service the Wal-Mart account and has demonstrated that he will not account to me for his actions. Instead, Anthony erroneously believes that he has license to "direct and control" Clear

13

JAC001257

Star while he provides product to Wal-Mart and completely ignores his responsibility and obligations to me under the Stipulation.

48. Since January 21, 2004, Anthony has been in constant breach of Second Stipulation by refusing to provide any documentary support whatsoever for the commissions payments that he does send to me from time to time.

49. Anthony has taken purposeful action and has unilaterally changed the "Retail Link" access codes to Wal-Mart's online account information in order to freeze me out of having any knowledge whatsoever about the status of the Wal-Mart account, its orders, sales, shipments, payments, and contractual status with Clear Star and/or Glass Star America, Inc..

50. Anthony has even fraudulently advised Wal-Mart that I have no authority with regard to Clear Star Products, Inc. and has opened a new Suffolk County National Bank bank account for Clear Star Products, Inc. so that he can funnel all Clear Star receivables through that account, which is subject his complete control.

51. Moreover, Anthony has refused to obtain the proper insurances to protect Clear Star from the products that his new company is manufacturing and shipping to Wal-Mart on Clear Star's behalf. This is all the more troubling considering that Clear Star's own insurances lapsed as of June 30, 2004, as a result of Anthony's refusal to communicate, cooperate, or approve any payments out of Clear Star. If Anthony timely procured the proper insurances to protect Clear Star from his/his new company's actions, Clear Star would not have even had to carry insurance through its policy termination date.

52. Anthony's unilateral actions, his refusal to obtain the necessary insurances, and his abject refusal to account for any sales made to Wal-Mart has placed Clear Star and me in an extremely vicarious position with regard to potential products liability and tax liability consequences.

14

JAC001258

53. Although the Second Stipulation originally gave Anthony until October 2005 to transition Wal-Mart to his new company Glass Star America, Inc., Anthony's actions have made that extended time-frame unworkable at best. The products liability and continuing tax problems and liability that Anthony's acts and omissions are wrongfully causing Clear Star to suffer must end immediately.

54. Accordingly, this Court should compel Anthony (i) to immediately transfer the Wal-Mart account to his new company Glass Star America, Inc., (ii) to provide a full accounting of all sales made to, product shipped to, and money received from Wal-Mart since January 21, 2004, (iii) to give me full access to Wal-Mart's "Retail Link" online customer account system so that I may be apprised of the business being done with Wal-Mart and the commissions that are and will be due me under the Second Stipulation for as long as "Clear Star" trademarked product is sold to Wal-Mart by Anthony and his new company, and, finally, (iv) enjoining Anthony from doing any business as a agent for or on behalf of Clear Star Products, Inc. with Wal-Mart or any other person or entity.

55. Upon transitioning Wal-Mart to his new company, Anthony will also have to cease using all UPC codes that are registered to Clear Star Products, Inc. in order to remove any connection and potential liability to Clear Star Products, Inc.

56. Although Anthony has engaged in a myriad of other abuses including misrepresenting his new company to Clear Star vendors, unilaterally attempting to cancel Clear Star's existing telephone numbers, converting and cashing out a life insurance policy that was supposed to be transferred to me (in exchange for my transfer of a policy to Anthony), and selling "Clear Star" trademarked products to customers that are not on his list "A" in violation of the Second Stipulation, those issues are not presented here for resolution.

## CONCLUSION

57. Anthony has demonstrated time and again that he has no interest in cooperating in the wind-down process and that he is incapable of honoring even the simplest of agreements.

58. As a result, this Court's immediate intervention is needed to ameliorate Anthony's purposeful inaction, his continued contempt for this Court's orders, and his continuing conversion of Clear Star money and property, so that the parties' separation and Clear Star's wind-down can be finalized once and for all.

59. This requires a court order approving of the accounts payable already paid, compelling Anthony to account for and to turn over the Clear Star money he or his company received, to return the company vehicle so that it may be sold, and to force him to transfer the Wal-Mart account to his new company so that Clear Star may close its books and terminate its tax and other potential liability.

60. This Court should also order Anthony to account for all of his Wal-Mart activity and sales and, on a going forward basis, to provide me access to Wal-Mart's "Retail Link" and to furnish me with sales documentation so that I may confirm the commissions that are due me under the Second Stipulation.

16

JAC001260

WHEREFORE, petitioner Gerald Jacino respectfully requests that this Court grant its motion in its entirety, together with such other and further relief as to this Court may seem just and proper.

_____
GERALD JACINO

Sworn to before me on this
7th day of July, 2004.

_____
Notary Public

BRYAN C. VAN COTT
Notary Public, State of New York
No. 02VA5077332
Qualified in Suffolk County
Commission Expires May 5, 2007

17

JAC001261