# EXHIBIT F

# SEPARATION PLAN
# FOR
# CLEAR STAR PRODUCTS INC.

I. <u>CLEAR STAR PRODUCTS INC.</u>:

   a. Distribution of Assets:

      i. <u>Fixed Assets</u>: Within 30 days of the parties' execution of the annexed So-Ordered Stipulation, the company's fixed assets shall be inventoried and the inventory shall be confirmed in writing by Anthony Jacino and Gerald Jacino so that there is agreement regarding the universe of assets to be distributed. The various types of assets held by Clear Star Products Inc. shall be divided between Anthony Jacino and Gerald Jacino pursuant to the method outlined below and, upon dissolution, Clear Star Products Inc. shall execute assignments and any other documents reasonably necessary to vest title in Anthony Jacino and/or Gerald Jacino as the case may be:

        1. Molds, Trays, and Dies – There are a number of different types of molds, trays, and dies located at the company's supplier and at the company's business premises. Anthony and Gerald shall each have the alternating option to select from the list of existing molds, trays, and dies, with the parties having an alternating first choice for each in accordance with the list below. The existing molds, trays, and dies may then be duplicated by the parties at the company's expense. Clear Star shall allocate funds to each shareholder for mold duplication costs in accordance with the duplication cost quotes received from Clear Star's present supplier. The cost of duplication will be paid by Clear Star to the party wishing to make a duplicate, and that party can employ who they wish to make the duplicate. All molds and dies located at the company's supplier that are to be duplicated should be shared until the duplications are made. Those molds should remain at their present location until all duplicates are made, which duplication period should not exceed one year. At that point, the parties may take possession of their molds and do with them what they wish. The parties may take possession of the molds, trays, and dies located at the company's business premises upon the company's dissolution..

          a. Injection Molds (located at supplier) – Anthony shall have the first choice.
          b. Vacuum Molds (located at company's offices) – Gerald shall have the first choice.
          c. Blister Molds (located at supplier) – Anthony shall have the first choice.
          d. Blister Sealing Trays (located at company's offices) – The trays shall be categorized by type, and Gerald shall have the first choice.

e. Cutting Dies (located at supplier and at company's offices) – Anthony shall have the first choice.

2. Mold Sharing – There are two molds that are rarely used by Clear Star (1) the box blow mold; and (2) the plate glass pedestal mold. Since duplicating these two molds is not cost-effective for the parties, Clear Star shall assign ownership to Anthony and Gerald jointly, and the parties agree to have the molds remain at their present location indefinitely. Neither party shall have the right to remove the molds and each should agree that the other is not responsible for any part of the cost of replacement should the molds become damaged.

3. Machinery – There are 12 types of machines located at the company's offices. The Vacuum Forming machine (est. cost $3,000) and the Chemical Loading Pipette machine (est. cost $17,460) should be duplicated immediately at the company's [*COMPLETE*] expense and the old and new machines should then be divided equally between the shareholders, each having the alternating option to select one from the list of old and new machines. Also, to the extent there any active (currently used) machines that have a duplicate already, but which duplicate is not operational, they should be made operational at the company's expense. Then, the machines should be divided equally between the shareholders, again, each having the alternating option to select one from the list. Jerry should have the first selection off of the list.

4. Vehicles – The one 1997 company truck should be sold on the open market. The sales price can then be used to cover a portion of the cost of duplicating the molds, trays, and dies.

5. Miscellaneous Tools – There is one drill press, one sander, one manual sealer, one shrink wrap sealer, one gold plating machine, one chop saw, one skill saw, and one tool box located at the company's offices. The tools should be divided equally between Anthony and Gerald, again, each having the alternating option to select one from the list. Anthony should have the first selection off of the list.

6. Computers – There are 9 computers (8 PC's and 1 Macintosh) located at the company's offices. A complete backup copy of the Macintosh computer's hard drive and the company's main computer(s) containing the operating software and related files (i.e. bookkeeping software and files) should be made at the company's expense and Anthony and Gerald should each receive a copy of the backups. To the extent that any proprietary software for the Walmart account exists, Anthony Jacino shall receive same. The computers should be divided equally between the shareholders,

[handwritten margin note: *Waiting on formal offer at indicated $700 to Frank*]

2

JAC000601

again, each having the alternating option to select one from the list. Jerry should have the first selection off of the list.

7. Printers – There are 10 printers located at the company's offices. The printers should be divided equally between Anthony and Gerald, again, each having the alternating option to select one from the list. Anthony should have the first selection off of the list.

8. Fax Machines – There are 2 fax machines (one located at the company's offices and the other in Anthony's possession). The fax machines should then be divided equally between the shareholders, again, each having the alternating option to select one from the list. Jerry should have the first selection off of the list.

9. Label Maker – There is one label maker located at the company's offices. The company should purchase an equivalent label maker (est. cost $3,500) and the label makers should then be divided equally between the shareholders, again, each having the alternating option to select one from the list. Anthony should have the first selection off of the list.

10. Furniture – There are various desks, chairs, tables, work tables, work stations, and shelving units located at the company's offices. All such fixtures should be inventoried and then be divided equally between Anthony and Gerald, again, each having the alternating option to select one from the list. Jerry should have the first selection off of the list.

11. Show Booths – There is a new show booth, an old show booth, a table top show booth, two headers, 10+ graphics displays and three miscellaneous items that should then be divided equally between Anthony and Gerald, again, each having the alternating option to select one from the list. Anthony should have the first selection off of the list.

12. Miscellaneous (other office equipment, supplies, files, shelving, etc.) – There is one time clock, one fire safe, 25 file cabinets, 6 book cases, one scanner, and two TV's located at the company's offices. These miscellaneous items should be inventoried by type, and then divided equally between Anthony and Gerald, again, each having the alternating option to select one from the list. Jerry should have the first selection off of the list.

ii. <u>Clear Star Customer Accounts/Representatives:</u>

1. Distributor Accounts and Regular Accounts – Anthony's attorney Kent Gross, Esq. presented in Court Anthony's proposed division of accounts based on sales from January through July 2003

3

JAC000602

(Accounts Divided Dollar for Dollar, a copy of which is annexed hereto). Mr. Gross also offered that should such a division be acceptable to Jerry, Jerry would be given his choice of what column of customers to select. The proposed division is acceptable to Jerry and he selects List B.

2. Prospective Accounts – Anthony's and Gerald's new companies may compete for the business of any customer not listed on the annexed customer List A or List B provided by Anthony.

3. Company Representatives – Clear Star's four sales representatives will have to be terminated by Clear Star and any commissions owing to those representatives should be paid by Clear Star as a company expense (account payable). The four company representatives shall be divided between Anthony and Gerald, with Anthony having his choice of the following Group A and Group B of representatives:
   Group A:    Lidel Fitzmaurice
               Trans Western Marketing

   Group B:    JOSCO
               Hawk Marketing

4. Non-Solicitation and Non-Compete Agreement – Anthony, Jerry, their relatives and any assignee or licensee of the patents held by the parties (and any company that such persons own, operate, control, or work for) should be bound by a non-solicitation and non-compete agreement with regard to the customers listed on the annexed customer List A and List B provided by Anthony. The term of the non-solicitation and non-compete should be 2 years so as to allow each party to establish a lasting relationship with their respective customers. The parties shall execute a written agreement memorializing their agreement in this regard.

5. Non-Disparagement Agreement – Anthony and Jerry shall each enter into an agreement whereby they agree not to disparage the other, the other's company, or their respective products.

iii. Suppliers: There shall be no restrictions regarding the use of suppliers. Anthony and Gerald may continue to use Clear Star's current suppliers at their own discretion. Each party agrees that the other party may continue to use the molds and/or dies that remain in Clear Star's present suppliers' possession until such time that all duplicates are made.

iv. Trade Names: Upon dissolution, Clear Star shall assign to Anthony Jacino and Gerald Jacino joint ownership of all U.S. and foreign trademarks that presently exist, provided that they agree in writing to only use those trademarks on product shipped to the customers on the annexed customer

4

List A and List B provided by Anthony. The parties shall agree in writing to not use "Clear Star" in any part of their new business name, to not assign the below listed trademark ownership rights to a third party, and to not use any of the assigned trademarks on their products or in their advertising, marketing, or other materials that are furnished to any other customers (new, prospective, or otherwise) not listed on the annexed List A and List B.

1. Clear Star
2. Super Vac
3. Instant Lens
4. Drive Safe
5. Super Bond
6. Headlight Saver

v. Accounts Receivable/Payable:

1. Post-Dissolution Receivables – Upon dissolution, a list of receivables shall be agreed upon in writing and no distribution of any receivables should be made until all of the company's obligations (payables) are paid in full. Thereafter, any money collected shall be split 50/50 between the parties. If there are uncollected receivables after a 90 day period, then the remaining accounts shall be divided equally (by monetary amount) and each party may pursue collection of such accounts, at their own cost, if they so choose.

2. Post-Dissolution Payables – Upon dissolution, a list of payables and other company obligations and liabilities shall be agreed upon and paid using Clear Star's receivables.

vi. Patents:

1. Existing Patents are held individually by Anthony and Gerald and each individual shall be entitled to utilize the patents for their new businesses.

2. Pending Patent Applications (2) – there are two (2) pending patent applications prepared by Art Auslander, Esq. and any costs associated with finalizing them shall be borne equally by Anthony and Gerald. Thereafter, once issued, each party will be entitled to utilize the patents for their new businesses. Anthony and Gerald

3. Ongoing Patent Costs – For existing patents, each party may, at their own cost and expense, be represented by counsel of their own choosing for all patent matters. For the two pending patent applications, the parties agree to split the cost, if any, of any remaining work to be done by Art Auslander, Esq. to finalize the

5

patents. Each party agrees to be responsible for one-half of any costs required to maintain the patents. If any party refuses to contribute their share of the costs, then they shall be deemed to have abandoned their ownership in the patent and the other party shall have the right to prevent any future infringement upon its use.

vii. Miscellaneous

1. Health Insurance – Clear Star's health insurance should be cancelled as of the date of its dissolution and the shareholders and Clear Star's employees may then continue coverage under COBRA for the statutory period or until they obtain replacement coverage.

2. Liability Insurance – Clear Star's liability insurance policies should all be cancelled as of the date of its dissolution or such other date thereafter as the parties mutually agree.

3. Key-Man Life Insurance – Clear Star is the owner of two $500,000 life insurance policies that insure the lives of the two shareholders Anthony and Gerald. Upon dissolution, Anthony and Gerald shall cause Clear Star to assign ownership of the respective policies to the shareholder whose life it insures, who may then continue (and pay for) such policies if they so desire.

4. Personal Life Insurance – Anthony and Gerald each owns a whole life insurance policy insuring the life of the other. Upon dissolution, Anthony and Gerald shall assign ownership of those policies to the other, who may then continue (and pay for) such policies if they so desire.

5. Pension Plan – the parties will discuss as soon as possible with the pension plan administrator their options regarding the existing pension plan (e.g. continuing the plan, terminating the plan and allowing the participants to roll their funds over into another investment vehicle, etc.). Anthony and Gerald shall mutually agree what approach to take.

6. Inventory – Clear Star's inventory that exists as of the date of dissolution shall be divided equally between Anthony and Gerald.

7. Work-in-Progress / Sub-Assemblies – As with inventory, and work-in-progress and sub-assemblies should be divided equally between Anthony and Gerald.

8. Company Telephone Numbers – Clear Star's telephone numbers shall be maintained for a period of 12 months after Clear Star's dissolution at the parties' expense, which they will share equally. An third party answering service shall be hired, again at the

expense of the parties, to answer all incoming calls and to forward all messages to each of the parties.

9. Post-Dissolution Calls to the Company – see Company Telephone Numbers above.

10. Post-Dissolution Correspondence to Company – As with the telephone calls, for a period of 12 months after Clear Star's dissolution, all Clear Star mail sent to 355 Marcus Boulevard shall be forwarded to a service hired at the parties' expense, which shall then forward a copy of all correspondence to each of the parties.

11. Post-Dissolution Faxes to Company -- As with the telephone calls, for a period of 12 months after Clear Star's dissolution, all Clear Star faxes shall be forwarded to a service hired at the parties' expense, which shall then forward a copy of all faxes to each of the parties.

12. Company Web Page – the company's web page shall be continued for a period of 6 months after Clear Star's dissolution, and it shall be altered so that each parties' forwarding address and contact information are contained on the web page.

13. Company Email Address -- for a period of 12 months after Clear Star's dissolution, all Clear Star emails shall be forwarded to a service hired at the parties' expense, which shall then forward a copy of all emails to each of the parties.

14. Company P.O. Box -- As with the telephone calls, for a period of 12 months after Clear Star's dissolution, all Clear Star mail sent to its P.O. Box shall be forwarded to a service hired at the parties' expense, which shall then forward a copy of all correspondence to each of the parties.

15. Existing Catalogs, brochures, etc. – Existing printed material (catalogues, etc.) shall be divided equally by Anthony and Gerald and used solely for the customers listed on the annexed List A and List B provided by Anthony. Clear Star's professional catalogue that is presently being printed in-house (in black and white on an as needed basis) shall be changed by the parties within 30 days of the dissolution date.

16. Boxes, Labels, etc. – all boxes, labels and other shipping supplies that exist as of the date of Clear Star's dissolution shall be divided equally between Anthony and Gerald.

7

## TWOMEY, LATHAM, SHEA & KELLEY, LLP
### ATTORNEYS AT LAW

THOMAS A. TWOMEY, JR.
STEPHEN B. LATHAM
JOHN L. SHEA, III
CHRISTOPHER D. KELLEY
MAUREEN T. LICCIONE
DAVID M. DUBIN
P. EDWARD REALE
PETER M. MOTT
GIOVANNI V. SHANE
JAY P. QUARTARARO
JANICE L. SNEAD
MARTHA L. LUFT
JANE DIGIACOMO

ANNE MARIE GOODALE
PHILIP D. NYKAMP
DANIEL M. DOUGLAS
LAURA L. SCHIAZZANO
MARTIN D. FINNEGAN
TRACY MADDEN PALUMBO
BRYAN C. VAN COTT

JUAN C. HATFIELD DA

33 WEST SECOND STREET
P. O. BOX 9398
RIVERHEAD, NEW YORK 11901

TELEPHONE: (631) 727-2180
FACSIMILE: (631) 727-1767

www.suffolklaw.com

email address: bvancott@suffolklaw.com

Extension 249

August 26, 2003

EAST HAMPTON OFFICE
20 MAIN STREET
EAST HAMPTON, N.Y. 11937
(631) 324-1200

SOUTHAMPTON OFFICE
51 HILL STREET
SOUTHAMPTON, N.Y. 11968
(631) 287-0090

PORT JEFFERSON OFFICE
105 MAIN STREET
PORT JEFFERSON STA., N.Y. 11776
(631) 928-4400

BAY SHORE OFFICE
ONE EAST MAIN STREET, SUITE 1
BAY SHORE, N.Y. 11706
(631) 665-9300

HAUPPAUGE OFFICE
300 TOWNLINE ROAD
HAUPPAUGE, N.Y. 11788
(631) 265-1400

**BY TELEFAX (800-783-5771)**

Kent Gross, Esq.
Law Offices of Robin L. Kissin, Esq., P.C.
P.O. Box 220
Quogue, NY 11959

Re: *Anthony Jacino v. Gerald Jacino et al.*
    *Index No.: 03-5862 (Suffolk County Supreme Court)*

Dear Mr. Gross:

As we discussed Friday morning, this confirms the parties' agreement to extend to Friday August 29, 2003, the deadline for the parties to reach an agreement regarding the division of Clear Star Products Inc.'s fixed assets and the sale of Midway Associates, Inc.'s only asset 355 Marcus Boulevard, Hauppauge, New York.

Enclosed please find Gerald Jacino's revised proposal, which now includes terms for the use and restrictions upon the company trade names and other miscellaneous items. As you can see, we are diligently proceeding in good faith in an attempt to reach a mutually acceptable separation plan that can be executed promptly. We trust you and your client are doing the same and we fully expect to receive your client's proposal - or if no proposal is forthcoming, his comments to Gerald's proposal - without delay.

Since the sale of the business premises held by Midway Associates, Inc. is part of the separation plan and proposal, we reiterate our position discussed with you on Friday that we believe it premature to pursue any contract negotiations with any potential third party purchaser. As a result, we cannot at this time consent to Anthony Jacino executing on Midway's behalf any "offer sheet" or any other document relating to the sale of the premises as suggested in your August 20, 2003 letter to us.

Kent Gross, Esq.
August 26, 2003
Page 2

　　　　Finally, we have not heard from you on the subject of Gerald Jacino's proposed withdrawal of $8,906 to equalize the shareholders' respective draws over the last 7 or so months. You have had nearly three weeks to satisfy yourself that the corporations can sustain the additional withdrawal by Gerald Jacino to equalize the disparity created by Anthony's issuance of checks to himself and others. Unless we receive from you a specific written objection by 5:00 p.m. on August 27, 2003 based on an analysis of the corporation's finances, we will assume that there is no legitimate objection, and, in accordance with our discussion and agreement reached in Court, Gerald will withdraw the sum of $8,906 to equalize the shareholders' respective draws.

　　　　Please call me upon your receipt of this letter to let me know when we can expect your client's proposal and/or comments and to schedule a time, preferably tomorrow morning, to discuss the parties' proposals and comments. Please be reminded that our client's consent to your client's proposed increase in the shareholder's monthly draw was conditioned upon, among other things, the parties reaching an agreement for the equitable dissolution of their corporations. We hope that can be accomplished by the end of this week.

　　　　　　　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　　　　　　　Bryan C. Van Cott

cc:　Mr. Gerald Jacino (via fax)
　　　Steven B. Latham, Esq.

JAC000608

## SEPARATION PLAN
## PROPOSED
## BY
## GERALD JACINO

I. **CLEAR STAR PRODUCTS, INC.:**

   a. Distribution of Assets:

      i. **Fixed Assets:** The company's fixed assets should be inventoried and the inventory should be confirmed by the shareholders so that there is agreement regarding the universe of assets to be distributed.

         1. Injection Molds – There are 8 injection molds located at the company's supplier. Those molds should be duplicated at the company's expense (est. cost $70,000 to $90,000) and the old and new molds should then be divided equally between the shareholders, each having the alternating option to select one from the list of old and new molds. Anthony may have the first selection. Until such time that the duplicate molds are made and the division of molds accomplished, the shareholders should each continue to have the right to use the existing molds for their new operations.

         2. Vacuum Molds – There are 10 vacuum molds located at the company's offices. These molds should be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Jerry should have the first selection off of the vacuum molds list.

         3. Blister Molds – There are 9 blister molds located at the company's supplier. Those molds should be duplicated at the company's expense (est. cost $7,000 to 12,000) and the old and new molds should then be divided equally between the shareholders, each having the alternating option to select one from the list of old and new molds. To be fair, this time Anthony should have the first selection off of the blister molds list. Until such time that the duplicate molds are made and the division of molds accomplished, the shareholders should each continue to have the right to use the existing molds for their new operations.

         4. Blister Sealing Trays – There are multiple quantities of 12 different types of blister sealing trays (62 total) located at the company's office. Each type of tray should be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Jerry should have the first selection off of the blister tray list.

JAC000609

5. Cutting Dies - There are 8 cutting dies located at the company's supplier and 8 cutting dies located at the company's offices. The dies located at the company's offices should be duplicated at the company's expense (est. cost $2,400). These cutting dies should be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Anthony should have the first selection off of the cutting dies list.

6. Machinery – There are 12 types of machines located at the company's offices. The Vacuum Forming machine (est. cost $2,500) and the Chemical Loading Pipette machine (est. cost $12,500) should be duplicated immediately at the company's expense and the old and new machines should then be divided equally between the shareholders, each having the alternating option to select one from the list of old and new machines. Also, to the extent there any active (currently used) machines that have a duplicate already, but which duplicate is not operational, they should be made operational at the company's expense. Then, the machines should be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Jerry should have the first selection off of the list.

7. Vehicles – Subject to the parties' agreement hereunder, the one 1997 company truck should be sold on the open market. The sales price can then be used to cover a portion of the cost of duplicating the injection molds.

8. Miscellaneous Tools – There is one drill press, one sander, one manual sealer, one shrink wrap sealer, one gold plating machine, one chop saw, one skill saw, and one tool box located at the company's offices. The tools should be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Anthony should have the first selection off of the list.

9. Computers – There are 9 computers (8 PC's and 1 Macintosh) located at the company's offices. A complete backup copy of the Macintosh computer's hard drive should be made at the company's expense and each shareholder should receive a copy of the backup. The computers should be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Jerry should have the first selection off of the list.

10. Printers – There are 10 printers located at the company's offices. The printers should then be divided equally between the

2

JAC000610

shareholders, again, each having the alternating option to select one from the list. To be fair, this time Anthony should have the first selection off of the list.

11. Fax Machines – There are 2 fax machines located at the company's offices. The fax machines should then be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Jerry should have the first selection off of the list.

12. Label Maker – There is one label maker located at the company's offices. The company should purchase an equivalent label maker (est. cost $4,000) and the label makers should then be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Anthony should have the first selection off of the list.

13. Furniture – There are various desks, chairs, tables, work tables, work stations, and shelving units located at the company's offices. All such fixtures should be inventoried then be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Jerry should have the first selection off of the list.

14. Show Booths – There is a new show booth, an old show booth, a table top show booth, two headers, 10+ graphics displays and three miscellaneous items that should then be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Anthony should have the first selection off of the list.

15. Miscellaneous (other office equipment, supplies, files, shelving, etc.) – There is one time clock, one fire safe, 25 file cabinets, 6 book cases, one scanner, and two TV's located at the company's offices. These miscellaneous items should be divided equally between the shareholders, again, each having the alternating option to select one from the list. To be fair, this time Jerry should have the first selection off of the list.

ii. Clear Star Customer Accounts/Representatives:

1. Distributor Accounts and Regular Accounts – Kent Gross presented in Court Anthony's proposed division of accounts based on sales from January through July 2003 (Accounts Divided Dollar for Dollar, a copy of which is annexed hereto). Mr. Gross also offered that should such a division be acceptable to Jerry, Jerry would be given his choice of what column of customers to select. The proposed division is acceptable to Jerry and he selects List B.

3

2. Prospective Accounts – A complete list of prospective accounts should be made and agreed upon. That list should then be divided equally between the shareholders, again, each having the alternating option to select one from the list. Anthony may have the first selection off of the list.

3. Company Representatives – Sales representatives should be terminated and any commissions owing to those representatives should be paid by Clear Star as a company expense (account payable).

4. Non-Compete Agreement – Anthony, Jerry, their relatives and any assignee or licensee of the patents held by the parties (and any company that such persons own, operate, control, or work for) should be bound by a non-compete agreement with regard to the customers and prospective customers allocated to each. The term of the non-compete should be 18 months so as to allow each party to establish a lasting relationship with their respective customers.

5. Non-Disparagement Agreement – Anthony and Jerry should each enter into an agreement whereby they agree not to disparage the other, the other's company, or their respective products.

iii. Suppliers: There should be no restrictions regarding the use of suppliers. The parties may continue to use the current suppliers at their own discretion. Each party should agree that the other party may continue to use the molds and/or dies that remain in the suppliers' possession until such time that all duplicates are made and the agreed-upon allocation is accomplished.

iv. Trade Names: For each of the trade names held by Clear Star Products, Inc. (see below), and so that each party may continue to benefit from the good will those trade names represent during the transition period (i.e. the end of Clear Star's operations and the initial start-up of the parties' new companies), each party should be entitled to continue to use the trade names and trade dress on product packaging (but not in any other respect, e.g., marketing, advertising, letterhead, etc.) for the duration of the non-compete period, namely, eighteen (18) months after the final dissolution of Clear Star Products, Inc., provided that they add to all packaging a prominent label with their new company name. This will allow a smooth transition to each company's new name and new trade dress, while allowing each party to continue to capitalize on the Clear Star name with minimal confusion in the marketplace. After 18 months, no party shall have the right to use any trade name listed below, and no party shall have the right to continue to use the existing trade dress of Clear Star Products, Inc.'s products. Each party should, however, be able to continue to

4

identify themselves as "a former owner of Clear Star Products, Inc." solely on business cards and in the body of any correspondence.

1. Clear Star
2. Super Vac
3. Instant Lens
4. Drive Safe
5. Super Bond
6. Headlight Saver

v. **Accounts Receivable/Payable:**

1. Post-Dissolution Receivables – A list of receivables should be agreed upon and no distribution of any receivables should be made until all of the company's obligations (payables) are paid in full. Thereafter, any money collected shall be split 50/50 between the parties. If there are uncollected receivables after a 120 day period, then the remaining accounts can be divided equally (by monetary amount) and each party may pursue collection of such accounts if it chooses.

2. Post-Dissolution Payables – A list of payables should be agreed upon and paid using the company's receivables. See above.

vi. **Patents:**

1. Existing Patents are held individually and each individual shall be entitled to utilize the patents for their new businesses.

2. Pending Patent Applications (2) – there are two (2) pending patent applications prepared by Art Auslander, Esq. and any costs associated with finalizing them should be borne equally by the parties. Thereafter, once issued, each party will be entitled to utilize the patents for their new businesses.

3. Ongoing Patent Costs – Each party should agree to be responsible for one-half of any costs required to maintain the patents. If any party refuses to contribute their share of the costs, then they should be deemed to have abandoned their ownership in the patent and the other party should have the right to prevent any future infringement upon its use.

vii. **Miscellaneous**

1. Health Insurance – Clear Star's health insurance should be cancelled as of the date of its dissolution and the shareholders and Clear Star's employees may then continue coverage under COBRA for the statutory period or until they obtain replacement coverage.

JAC000613

2. Liability Insurance – Clear Star's liability insurance policies should all be cancelled as of the date of its dissolution or such other date thereafter as the parties mutually agree.

3. Key-Man Life Insurance – Clear Star is the owner of two $500,000 life insurance policies that insure the lives of the two shareholders. The parties should cause Clear Star to assign ownership of the respective policies to the shareholder whose life it insures, who may then continue (and pay for) such policies if they so desire.

4. Pension Plan – the parties should discuss as soon as possible with the pension plan administrator their options regarding the existing pension plan (e.g. continuing the plan, terminating the plan and allowing the participants to roll their funds over into another investment vehicle, etc.). They should then mutually agree what approach to take.

5. Inventory – Clear Star's inventory that exists as of the date of dissolution should be divided equally between the shareholders.

6. Work-in-Progress / Sub-Assemblies – As with inventory, and work-in-progress and sub-assemblies should be divided equally between the shareholders.

7. Company Telephone Numbers – Clear Star's telephone numbers should be maintained for a period of 12 months after Clear Star's dissolution at the parties' expense. An answering service should be hired, again at the expense of the parties, to answer all incoming calls and to forward all messages to each of the parties.

8. Post-Dissolution Calls to the Company – see Company Telephone Numbers above.

9. Post-Dissolution Correspondence to Company – As with the telephone calls, for a period of 12 months after Clear Star's dissolution, all Clear Star mail sent to 355 Marcus Boulevard should be forwarded to a service hired at the parties' expense, which should then forward a copy of all correspondence to each of the parties.

10. Post-Dissolution Faxes to Company – As with the telephone calls, for a period of 12 months after Clear Star's dissolution, all Clear Star faxes should be forwarded to a service hired at the parties' expense, which should then forward a copy of all faxes to each of the parties.

JAC000614

11. Company Web Page – the company's web page should be continued for a period of 12 months after Clear Star's dissolution, and it should be altered so that each parties' forwarding address and contact information are contained on the web page.

12. Company Email Address – for a period of 12 months after Clear Star's dissolution, all Clear Star emails should be forwarded to a service hired at the parties' expense, which should then forward a copy of all emails to each of the parties.

13. Company P.O. Box – As with the telephone calls, for a period of 12 months after Clear Star's dissolution, all Clear Star mail sent to its P.O. Box should be forwarded to a service hired at the parties' expense, which should then forward a copy of all correspondence to each of the parties.

14. Existing Catalogs, brochures, etc. – All catalogues, brochures, and similar marketing materials should be divided equally between the shareholders.

15. Boxes, Labels, etc. – all boxes, labels and other shipping supplies that exist as of the date of Clear Star's dissolution should be divided equally between the shareholders.

II. **MIDWAY ASSOCIATES, INC.**

a. Sale of 355 Marcus Boulevard, Hauppauge, NY – Kent Gross shared with us the offer by Denelex Restart to purchase the premises for $1,400,000.00, which purchase is contingent upon an acceptable environmental report. We calculated the tax impact and penalties that a sale to a third party will have upon the shareholder's respective share of the purchase price (see annexed worksheet). In short, each shareholder will receive a net amount of **$189,283** from such a sale. In light of the foregoing, Jerry offers to purchase Anthony's 50% share in Midway for **$230,000.00** in cash, which is $40,000.00 more than Anthony would receive if the premises were sold to a third party.

JAC000615